MATT O'MALLEY (SBN 272802)
JOSH BROOKS (SBN 315602)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

Attorneys for Plaintiffs
SAN DIEGO COASTKEEPER and COASTAL ENVIRONMENTAL RIGHTS
FOUNDATION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> City of San Diego, a municipal corporation, <br><br> Defendant. | Civil Case No.: **'18 CV 1757 JM   WVG** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper (collectively referred to herein as "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*. (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 and § 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On May 23, 2018, Plaintiffs issued five 60-day notice letters ("Notice Letters") to Defendant City of San Diego ("Defendant" or "City"), owner and operator of the West Miramar Sanitary Landfill ("WMSL Facility"), the Metro Biosolids Center ("MBC Facility"), the Point Loma Wastewater Treatment Plant ("PLWWTP Facility"), the South Bay Water Reclamation Plant ("SBWRP Facility"), and the North City Water Reclamation Facility ("NCWRP Facility"), regarding its violations of the Clean Water Act, and of Plaintiffs' intention to file suit against Defendant. The Notice Letters were sent to the registered agent for Defendant as required by 40 C.F.R. § 135.2(a)(2), the five facilities, as well as the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Diego Region ("Regional Board") as required by CWA, 33 U.S.C. § 1365(b)(1)(A). True and correct copies of the five Notice Letters are attached hereto as Exhibit A and incorporated herein.

3.      More than sixty days have passed since the Notice Letters were served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. (33

U.S.C. § 1365(b)(1)(B)). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.   INTRODUCTION

5.      This complaint seeks relief for the Defendant's unlawful discharge of pollutants into waters of the United States from its operations at 5180 Convoy Street, San Diego California 92111 ("West Miramar Sanitary Landfill" or "WMSL Facility"), 5240 Convoy Street, San Diego California 92111 ("Metro Biosolids Center" or "MBC Facility"), 1902 Gatchell Rd, San Diego California 92106 ("Point Loma Wastewater Treatment Plant" or "PLWWTP Facility"), 2411 Dairy Mart Rd, San Diego California 92154 ("South Bay Water Reclamation Plant" or "SBWRP Facility"), and 4949 Eastgate Mall, San Diego California 92121 ("North City Water Reclamation Plant" or "NCWRP Facility") (collectively "City Facilities" or "Facilities"). Specifically, Defendant has been discharging and continues to discharge polluted storm water from its WMSL Facility, MBC Facility, and NCWRP Facility into storm drains, San Clemente Creek, Rose Creek, Mission Bay, and the nearby Pacific Ocean; from its PLWWTP Facility into the Pacific Ocean near Cabrillo National Monument; and from its SBWRP Facility into the Tijuana River, the Tijuana River Estuary, and the Pacific Ocean (all collectively referred to as the "Receiving Waters") in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1301,1342. This complaint also seeks relief for Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of California's General Permit for Discharges Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and*

*Order No. 2014-0057-DWQ)* ("Industrial Permit"). This complaint further seeks relief to prevent discharges in violation of the Industrial Permit as amended by *Order No. 2014-0057-DWQ* (New Industrial Permit). These are ongoing and continuous violations of the Clean Water Act and the Industrial Permit. Plaintiffs seek a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations of the Clean Water Act.

6.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as City Facilities' wastewater treatment, biosolids processing, and/or municipal waste disposal and composting operations, flow into storm drain systems, local tributaries including San Clemente Creek, Rose Creek, and the Tijuana River, the Tijuana River Estuary, Mission Bay, and the Pacific Ocean. Among these Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish and hundreds of bird species as well as macro-invertebrate and invertebrate species. This discharge of pollutants in storm water from industrial activities at City Facilities contributes to the impairment of downstream waters and compromises or destroys their beneficial uses.

## III.    PARTIES

### A.    San Diego Coastkeeper and Coastal Environmental Rights Foundation

7.      Plaintiff San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California.

8.      San Diego Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges and habitat degradation. Coastkeeper implements this mission through outreach and education programs that work to prevent water pollution, as well as community activism, participation in governmental hearings,

and prosecuting litigation to ensure that San Diego's beaches, bays, coastal waters and tributary streams and rivers meet all substantive water quality standards guaranteed by Federal, State and local statutes and regulations. When necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

9. San Diego Coastkeeper's office is located at 2825 Dewey Road, Suite 207, San Diego, California, 92106.

10. Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California.

11. CERF's office is located at 1140 South Coast Highway 101, Encinitas California, 92024.

12. CERF was founded by surfers in North San Diego County and active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

13. Plaintiffs have thousands of members who live and/or recreate in and around San Clemente Creek, Rose Creek, Mission Bay, the Tijuana River, the Tijuana River Estuary, and the Pacific Ocean (Receiving Waters).

14. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

15. Discharges of polluted storm water from the WMSL Facility, the MBC Facility, the NCWRP Facility, the PLWWTP Facility, and the SBWRP Facility degrade water quality, harm aquatic life in the Receiving Waters, and impair Plaintiffs' members' use and enjoyment of the Receiving Waters.

16. Defendant's polluted discharges from the WMSL Facility, the MBC Facility, the NCWRP Facility, the PLWWTP Facility, and the SBWRP Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being,

and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Industrial Permit.

17.     The relief sought herein will redress the harms to Plaintiffs caused by Defendant's activities. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs' members, for which harm they have no plain, speedy or adequate remedy at law.

### B.     City Facilities Owners and/or Operators

18.     Plaintiffs are informed and believe that the City of San Diego is a chartered city of the State of California under the authority set forth in the California Government Code.

19.     Plaintiffs are informed and believe that the City of San Diego is the owner of the WMSL Facility, which is located at 5180 Convoy Street, San Diego California 92111, the MBC Facility, which is located at 5240 Convoy Street, San Diego California 92111, the PLWWTP Facility, which is located at 1902 Gatchell Rd, San Diego California 92106, the SBWRP Facility, which is located at 2411 Dairy Mart Rd, San Diego California 92154, and the NCWRP Facility, which is located at 4949 Eastgate Mall, San Diego California 92121.

20.     Plaintiffs are informed and believe that the City of San Diego is the operator of the WMSL Facility, which is located at 5180 Convoy Street, San Diego California 92111, the MBC Facility, which is located at 5240 Convoy Street, San Diego California 92111, the PLWWTP Facility, which is located at 1902 Gatchell Rd, San Diego California 92106, the SBWRP Facility, which is located at 2411 Dairy Mart Rd, San Diego California 92154, and the NCWRP Facility, which is located at 4949 Eastgate Mall, San Diego California 92121.

## IV. STATUTORY BACKGROUND

### A.     The Clean Water Act

21.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies

with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

22.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p)). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342).

23.     Section 402(b) of the CWA allows each state to administer its own EPA-approved permit for storm water discharges. (33 U.S.C. § 1342(b)). In California, the State Board is charged with regulating pollutants to protect California's water resources.

24.     Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology (BCT) for conventional pollutants. See 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

25.     Clean Water Act regulations found in 40 C.F.R. Part 445 – Landfills Point Source Category (Subchapter N) require facilities designated as Landfills to monitor "contaminated storm water," defined as storm water that has come into contact with landfill wastes, waste handling and treatment areas, or landfill wastewater, and sample such "contaminated storm water" for additional parameters including BOD, TSS, Ammonia (as N), α-Terpineol, Benzoic acid, p-Cresol, Phenol, and Zinc. See 40 C.F.R. § 445.1-3, 40 C.F.R. § 445.20-23.

26.     The Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. (33 U.S.C. § 1342).

7

27.     Section 505(a)(1) of the CWA provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or an order issued by the Administrator or a State with respect to such a standard or limitation." (33 U.S.C. § 1365(a)(1)).

28.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

29.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring after January 27, 2009 and $51,750 for violations occurring after November 2, 2015. (33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4).

30.     Section 505(d) of the Clean Water Act permits prevailing parties to recover costs, including attorneys' and experts' fees. (33 U.S.C. § 1365(d)).

### B.     Industrial Permit

31.     The Industrial Permit, NPDES General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ is an NPDES permit adopted pursuant to Section 402 of the CWA, 33 U.S.C. § 1342(b) and 40 C.F.R § 123.25. In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. The Industrial Permit as amended pursuant to Order No. 2014-0057-DWQ became effective July 1, 2015 ("New Industrial Permit").

32.     Failure to comply with the Industrial Permit or New Industrial Permit constitutes a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A.).

### Discharge Prohibitions and Effluent Limitations of the Industrial Permit

33.     Discharge Prohibitions A(1) of the Industrial Permit and III.B. of the New Industrial Permit prohibit the direct or indirect discharge of materials other than storm

water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibitions A(2) of the Industrial Permit and III.C. of the New Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

34.     Effluent limitations B(3) of the Industrial Permit and Sections I.D and V.A. of the New Industrial Permit require facility operators to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform, among others.

35.     EPA's NPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity ("MSGP") sets numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

36.     The EPA Benchmarks provide an objective standard to determine whether a facility's Best Management Practices ("BMPs") are successfully developed and/or implemented. *See* EPA Proposed Multi-Sector General Permit (2013), Fact Sheet, p. 50; *see also*, EPA Multi-Sector General Permit (2008), Fact Sheet, p. 106; EPA Multi-Sector General Permit, 65 Federal Register 64839 (2000).

37.     The Section I(M) and Finding 62 of the New Industrial Permit include Numeric Action Levels (NALs) that are based on Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility". *See* Section I(M) (Finding 61) of the New Permit.

38.     Discharges from an industrial facility containing pollutant concentrations

1  that exceed EPA Benchmarks indicate that the facility has not developed and/or

2  implemented BMPs that meet BAT for toxic pollutants and BCT for conventional

3  pollutants. *Id.*

4        39.    Effluent limitations B(1) of the Industrial Permit and Sections I.K and

5  V.B. of the New Industrial Permit require facility operators of facilities in specific

6  industrial categories to comply with Effluent Limitations Guidelines at 40 C.F.R.

7  Chapter 1 Subchapter N (Subchapter N).

8        40.    Landfills are industrial facilities designated under 40 C.F.R. Part 445 and

9  are subject to Effluent Limitations Guidelines found in 40 C.F.R. Chapter I Subchapter

10  N. (*See* Attachment A to the General Industrial Permit, "Facilities Covered by National

11  Pollution Discharge Elimination System General Permit for Storm Water Discharges

12  Associated with Industrial Activities (General Permit)").

13          **Receiving Water Limitations of the Industrial Permit**

14        41.    Industrial Permit Receiving Water Limitation C(1) and New Industrial

15  Permit Receiving Water Limitation VI.B. prohibit storm water discharges and

16  authorized non-storm water discharges to surface or groundwater that adversely impacts

17  human health or the environment.

18        42.    Industrial Permit Receiving Water Limitation C(2) and New Industrial

19  Permit Receiving Water Limitation VI.A. prohibit storm water discharges and

20  authorized non-storm water discharges that cause or contribute to an exceedance of an

21  applicable water quality standard in a Statewide Water Quality Control Plan or the

22  applicable Regional Board's Basin Plan.

23        43.    Water Quality Standards ("WQS") are pollutant concentration levels

24  determined by the State Board, the various regional boards, and/or the EPA to be

25  protective of the beneficial uses of the waters that receive polluted discharges.

26        44.    WQS applicable to dischargers covered by the Storm Water Permit

27  include, but are not limited to, those set out in the *Water Quality Control Plan for the*

28  *Ocean Waters of California*, State of California State Water Resources Control Board

("Ocean Plan"), the *Water Quality Control Plan for the San Diego Basin*, California Regional Water Quality Control Board, San Diego Region ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

45.     The CTR includes numeric criteria set to protect human health and the environment in the state of California.[1]

46.     The Ocean Plan identifies the "Beneficial Uses" of the ocean waters of the state.

47.     The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.

48.     The Beneficial Uses for Receiving Waters near the point at which they receive polluted storm water discharges from the MBC Facility, the WMSL Facility, and the NCWRP Facility include: Contact Water Recreation; Non-contact Water Recreation; Wildlife Habitat; Spawning, Reproduction, and/or Early Development; Warm Freshwater Habitat; Cold Freshwater Habitat; and Rare, Threatened, or Endangered Species. *See* Basin Plan at Table 2-2.

49.     The Beneficial Uses for Receiving Waters near the point at which they receive polluted storm water discharges from the SBWRP Facility include: Non-contact Water Recreation; Wildlife Habitat; Warm Freshwater Habitat; Preservation of Biological Habitats of Special Significance; and Rare, Threatened, or Endangered Species. *See* Basin Plan at Table 2-2.

50.     The Beneficial Uses for Receiving Waters near the point at which they receive polluted storm water discharges from the PLWWTP Facility include: Contact Water Recreation and Shellfish Harvesting. *See* Basin Plan at Table 2-3; *See* Ocean Plan at Section II.B.1.a.1.

---

[1] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 *available at*: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

51.     A surface water that cannot support its Beneficial Uses listed in the Basin Plan is designated as an impaired water body pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

52.     Discharges of pollutants at levels above WQS, including the CTR, contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

53.     Rose Creek is on the 303(d) list as impaired for selenium and toxicity. The mouth of Rose Creek is on the 303(d) list as impaired for lead and for eutrophic conditions (nutrients). Coastkeeper monitoring data, reported in CEDEN, shows Rose Creek is impaired for bacteria.

54.     The Mission Bay Shoreline at Campland, near the mouth of Rose Creek, is on the 303(d) list as impaired for Enterococcus, Fecal Coliform, and Total Coliform.

55.     The Tijuana River is on the 303(d) list as impaired for eutrophic conditions, indicator bacteria, low dissolved oxygen, pesticides, phosphorus, sedimentation/siltation, selenium, solids, surfactants (MBAS), synthetic organics, total Nitrogen as N, toxicity, trace elements, and trash.

56.     The Tijuana River Estuary is on the 303(d) list as impaired for eutrophic conditions, indicator bacteria, lead, low dissolved oxygen, nickel, pesticides, thallium, trash, and turbidity.

**57.**     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the Storm Water Permit and VI.A-C. of the New Storm Water Permit.

**Storm Water Pollution Prevention Requirements of the Industrial Permit**

58.     Section A(1) and Provision E(2) of the Industrial Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A. and B. of the New Industrial Permit require development and implementation of site-specific SWPPPs by

July 1, 2015 or upon commencement of industrial activity.

59.     The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Sites, and identify and implement site-specific Best Management Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges. (Industrial Permit, Section A(2); New Industrial Permit, Section X.C.1). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT, and as necessary to comply with the Storm Water Permit. (Industrial Permit Section A(2); New Industrial Permit, Sections X(C) and I(D), Finding #32).

60.     To ensure its effectiveness, the SWPPP must be evaluated on an annual basis, and it must be revised as necessary to ensure compliance with the Permit. (Industrial Permit, Sections A(9), (10); New Industrial Permit, Sections X.A. and X.B.1.).

61.     Sections A(3) through A(10) of the Industrial Permit and Sections X.A to X.I. of the New Industrial Permit set forth the requirements for a SWPPP.

62.     The SWPPP must include a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity. (Industrial Permit, Section A(4); New Industrial Permit, Section X.E.).

**Monitoring and Reporting Requirements of the Industrial Permit**

63.     Dischargers are also required to prepare and implement a monitoring and reporting program ("M&RP"). (Industrial Permit, Sections E(3), B(1); New Industrial Permit, Section XI).

64.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised as necessary, and to ensure that storm water discharges are in compliance with the Industrial Permit (up to July 1, 2015) and

New Industrial Permit (July 1, 2015 and thereafter) Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Industrial Permit, Section B(2); New Industrial Permit, Finding J.56).

65.     The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. (Industrial Permit, Sections B(2)(a) and B(2)(d); New Industrial Permit Section XX.B. and Fact Sheet Section J., page 43.)

66.     The Industrial Permit and the New Industrial Permit require that the SWPPP must be revised as necessary to ensure compliance with the Storm Water Permit. (Industrial Permit; Section A.10(d); New Industrial Permit, Section X.B.).

67.     The Industrial Permit and New Industrial Permit require dischargers to conduct visual observations for the presence of unauthorized non-storm water discharges, to document the source of any discharge, and to report the presence of any discolorations, stains, odors, and floating materials in the discharge.

68.     The Industrial Permit and New Industrial Permit require dischargers to visually observe drainage areas during the wet season (October 1 - May 30) and to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants.

69.     Both the Industrial Permit and New Industrial Permit require dischargers to maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges.

70.     The Industrial Permit requires dischargers to collect a sample from all discharge points during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season. (Industrial Permit, Section (B)(5)). The New Industrial permit requires dischargers to collect and analyze storm water samples from two storm events with the first half of each reporting year (July 1 to December 31) and two from the second half (January 1 to

June 30). (New Industrial Permit, Section XI.B.2.).

71.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants associated with industrial activity and likely to be present in in the storm water discharged from the facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

72.     Dischargers with facilities subject to storm water ELGs in Subchapter N collect and analyze samples from QSEs for each regulated pollutant specified in the appropriate category in Subchapter N. (Section I.B., New Industrial Permit; Section B(6) Industrial Permit).

73.     Dischargers must submit "Annual Reports" to the Regional Board in July of each year. (Industrial Permit, Section B(14); New Industrial Permit, Section XVI.A.).

74.     Section XX.B.1. of the New Industrial Permit requires facility operators to (a) conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, (b) assess the facility's SWPPP and its implementation to determine whether additional BMPs or SWPPP implementation measures are necessary to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI), and (c) certify and submit via SMARTS documentation based upon the above facility evaluation and assessment that: (i) additional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations (Section VI); or (ii) no additional BMPs or SWPPP implementation measures are required to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI).

75.     The Industrial Permit requires that all reports, certifications, or other information required by the Storm Water Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators (Industrial Permit Section C(9); New Industrial Permit Section XX.K.).

Complaint for Declaratory and Injunctive Relief and Civil Penalties

76.     The Industrial Permit requires that signatories under Sections C(9) and C(10) of the Industrial Permit and Section XX.K. and XX.L. of the New Industrial Permit to make the following certification: "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

77.     Section C(11)(d) of the Industrial Permit requires facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. (Industrial Permit, Section C(11)(d)).

78.     Section XVI.B. of the New Industrial Permit requires facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports must contain (1) a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the Industrial Permit, (2) an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, (3) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and (4) the date(s) of the Annual Evaluation. (New Industrial Permit, Section XVI.B.).

79.     Dischargers who cause or contribute to an exceedance of a water quality

Complaint for Declaratory and Injunctive Relief and Civil Penalties

standard must comply with Water Quality Based Corrective Actions. (New Industrial Permit, Section XX.B.).

80.     Failure to adequately comply with the Water Quality Based Corrective Actions of Section XX.B. of the New Industrial Permit is a violation of the Industrial Permit. New Industrial Permit Fact Sheet at 22.

## V.     STATEMENT OF FACTS

### A. West Miramar Sanitary Landfill

81.     Plaintiffs are informed, believe, and thereon allege Defendant City of San Diego operates the WMSL Facility located at 5180 Convoy Street, San Diego California 92111, and leases the land on which the WMSL Facility is located from the United States Government, Department of the Navy, Marine Corps Air Station (MCAS) Miramar.

82.     Plaintiffs are informed, believe, and thereon allege the WMSL Facility is approximately 801 acres.

83.     Plaintiffs are informed, believe, and thereon allege that at least 563 acres of the WMSL Facility are classified as areas of industrial activities and materials exposed to precipitation.

84.     Plaintiffs are informed, believe, and thereon allege the WMSL Facility is bordered to the north by MCAS Miramar, to the east by the North Miramar Landfill, to the south by the South Miramar Landfill, and to the west by Interstate 805.

85.     Plaintiffs are informed, believe, and thereon allege the WMSL Facility is assigned the standard industrial classifications (SIC) codes of 4953 under the category of "Refuse Systems"; and 2875, "Fertilizers, Mixing Only."

86.     Plaintiffs are informed, believe, and thereon allege the WMSL Facility is utilized for Class III municipal solid waste disposal operations and composting operations.

87.     Plaintiffs are informed, believe, and thereon allege various industrial materials comprised of metals, fuels, nutrients, bacteria, oils and grease, organic

compounds, debris, and sediment are utilized and/or present onsite.

88.    Plaintiffs are informed, believe, and thereon allege the WMSL Facility Owners and/or Operators engage in the following industrial operations: all activities required to dispose of Class III municipal solid waste and operation of composting activities, and WMSL Facility and equipment maintenance including vehicle maintenance, repair, washing, and fueling.

89.    Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with operations at the WMSL Facility include, but are not limited to: ammonia as nitrogen; pH-affecting substances; oil and grease; total suspended solids; enterococcus; nitrate, nitrite, and total nitrogen; phosphorous; total coliform; fecal coliform; BOD; COD; α-Terpineol, Benzoic acid, p-Cresol, Phenol, metals; gasoline; and diesel.

90.    Plaintiffs are informed, believe, and thereon allege that most operations at the WMSL Facility occur outdoors and expose pollutants to rainfall.

91.    Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the WMSL Facility are exposed to storm water at the WMSL Facility.

92.    Plaintiffs are informed, believe, and thereon allege activities at the WMSL Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the WMSL Facility. During rain events, this pollution is washed off those surfaces and into storm water discharge points, which flow to Receiving Waters.

93.    Plaintiffs are informed, believe, and thereon allege storm water is discharged from at least five discharge points at the WMSL Facility into Receiving Waters.

94.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (See 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters

but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

95.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)). A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

96.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

97.     Information available to Plaintiffs indicates that each of the surface waters into which the WMSL Facility discharges polluted storm water are tributaries to traditional navigable waters, such as Rose Creek, Mission Bay, and the Pacific Ocean.

98.      Plaintiffs are informed, believe, and thereon allege the WMSL Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters. Elevated levels of bacteria, metals, nutrients, and sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their beneficial uses.

99.     Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the receiving waters. Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

100.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40

C.F.R. § 131.38, ("California Toxics Rule" or "CTR") and in the Basin Plan. The CTR limits are, in part, as follows for freshwater: lead – .065 mg/L; zinc – .12 mg/L; selenium – .005 mg/L; copper – .014 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

101.    EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (*See* Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP) Fact Sheet, pp. 55-56). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id.*, at p. 65).

102.    The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at p. 1-1). The Basin Plan identifies several beneficial uses for regional waters, including for San Clemente Creek, Rose Creek, and Mission Bay.

103.    The Basin Plan establishes the following water quality objectives for freshwater in San Clemente Creek and Rose Creek: enterococci: 61 MPN/100 ml; fecal coliform: 400 MPN/100 mL; total coliform: 10000 MPN/100mL. The Basin Plan establishes the following water quality objectives for saltwater in Mission Bay and the Pacific Ocean: enterococci: 104 MPN/100 ml.

**B. Past and Present Industrial Activity at the WMSL Facility**

104.    The potential pollutant sources associated with the industrial activities at

Complaint for Declaratory and Injunctive Relief and Civil Penalties

the WMSL Facility include, but are not limited to: active solid waste landfilling; stockpile areas; fueling area; equipment maintenance; Upper Miramar Greenery composting; Lower Greenery wood material and green material processing and composting; hazardous materials storage; blade cleanout area; and haul roads.

105.    Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the WMSL Facility therefore include but are not limited to: ammonia as nitrogen; pH-affecting substances; oil and grease; total suspended solids; enterococcus; nitrate, nitrite, and total nitrogen; phosphorous; total coliforms; fecal coliforms; BOD; COD; toxic metals such as copper, iron, zinc, lead, and aluminum; α-Terpineol, Benzoic acid, p-Cresol, Phenol; gasoline; and diesel.

106.    Plaintiffs are informed, believe, and thereon allege that some operations at the WMSL Facility occur outdoors and are causing pollutants to be exposed to rainfall.

107.    Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the WMSL Facility are exposed to storm water at the WMSL Facility.

108.    Plaintiffs are informed, believe, and thereon allege "contaminated storm water", defined in 40 C.F.R. Chapter I, Subchapter N, Part 445 as storm water that has come into direct contact with landfill wastes, waste handling and treatment areas, or landfill wastewater, is discharged from the WMSL Facility into Receiving Waters.

109.    Plaintiffs are informed, believe, and thereon allege water application for dust control and soil compaction, water from natural springs, and ice machine condensate is discharged from the WMSL Facility into Receiving Waters.

110.    Discharges of water applied for dust control and soil compaction, water from natural springs, ice machine condensate, and pollutants in such water via the storm water conveyance system constitute unauthorized non-storm water discharges.

111.    Plaintiffs are informed, believe, and thereon allege that the WMSL Facility lacks effective BMPs to control the flow of storm water from the WMSL Facility into storm water conveyance systems.

112.     Plaintiffs are informed, believe, and thereon allege that the WMSL Facility lacks effective BMPs to control the flow of water applied for dust control and soil compaction, water from natural springs, and ice machine condensate from the WMSL Facility into storm water conveyance systems and Receiving Waters.

113.     Plaintiffs are informed, believe, and thereon allege that the WMSL Facility lacks effective BMPs to control the flow of contaminated storm water, as defined in 40 C.F.R. Chapter I, Subchapter N, Part 445, from the WMSL Facility into storm water conveyance systems and Receiving Waters.

114.     Suspended solids, metal particles, nutrients, bacteria, and other pollutants have been and continue to be conveyed from the WMSL Facility into storm drain conveyance systems and Receiving Waters.

115.     Plaintiffs are informed, believe, and thereon allege that the WMSL Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the WMSL Facility.

**C. The WMSL Facility and its Associated Discharge of Pollutants**

116.     Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the WMSL Facility discharges polluted storm water from the industrial activities at the WMSL Facility via storm drainage systems and into the Receiving Waters.

117.     Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the WMSL Facility discharges contaminated storm water, as defined in 40 C.F.R. Chapter I, Subchapter N, Part 445, from activities at the WMSL Facility via storm drainage systems and retention basins and into the Receiving Waters.

118.     Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the WMSL Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit properly regulates discharges to those waters.

119.     Plaintiffs are informed, believe, and thereon allege that the storm water

discharged from the WMSL Facility has exceeded the CTR Water Quality Standards applicable to lead in California. For example, Defendant's 2016-2017 monitoring data indicates levels of lead as high as 1.24 mg/L, which is over nineteen times the freshwater CTR limit of .065 mg/L and over fifteen times the EPA Benchmark value of .082 mg/L[2].

120.    Plaintiffs are informed, believe, and thereon allege that the storm water discharged from the WMSL Facility has exceeded the CTR Water Quality Standards applicable to zinc in California. For example, Defendant's 2016-2017 annual report monitoring data indicates levels of zinc as high as 6.03 mg/L, which is over fifty times the CTR limit of .12 mg/L and the EPA Benchmark value for zinc of .12 mg/L[3].

121.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the WMSL Facility has exceeded the EPA Benchmark value for nitrate + nitrate. For example, Defendant's 2015-2016 monitoring data indicates exceedance levels of nitrate + nitrate at 6.1 mg/L, which is almost 9 times the EPA benchmark value for nitrate + nitrate of .68 mg/L (MSGP, Fact Sheet, p. 55).

122.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the WMSL Facility has exceeded the Basin Plan water quality objective for enterococci. For example, Defendant's 2017-2018 monitoring data indicates exceedance levels of enterococci at 1600000 MPN/100mL, which is 26,230 times the Basin Plan water quality objective for enterococci of 61 MPN/100mL (*See* Basin Plan at p. 3-7).

123.    Plaintiffs are informed, believe, and thereon allege that during every significant rain event that has occurred at the WMSL Facility since at least May 23, 2013 through the present, Defendant has discharged and continues to discharge storm water from the WMSL Facility that contains pollutants at levels in violation of the

---

[2] This benchmark value is hardness-dependent. Assuming the 100 mg/L water hardness range applies, the benchmark is .082 mg/L. (MSGP Fact Sheet, p. 55)
[3] This benchmark value is hardness-dependent. Assuming the 100 mg/L water hardness range applies, the benchmark is .014 mg/L. (MSGP, Fact Sheet, p. 56)

prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

124.    Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the WMSL Facility.

125.    The inadequacy of the BMPs at the WMSL Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP.

126.    Storm water discharges from the WMSL Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

127.    Plaintiffs are informed, believe, and thereon allege that since at least May 23, 2013 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT and Effluent Limitation Guidelines at the WMSL Facility.

128.    Plaintiffs are informed, believe, and thereon allege WMSL Facility's repeated exceedances of EPA Benchmarks and applicable Water Quality Standards over the past five years for pollutants, including lead, iron, phosphorus, total suspended solids, total coliform, fecal coliform, enterococci, oil and grease, aluminum, chemical oxygen demand, pH-affecting substances, and nitrate + nitrite, indicate that the WMSL Facility has failed and continues to fail to meet BAT/BCT.

129.    Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

130.    Based on their investigation of the WMSL Facility, Plaintiffs are informed and believe that Defendant has failed to develop and implement an adequate SWPPP since at least May 23, 2013 through the present.

131.    Defendant has not developed and/or implemented BMPs to adequately minimize the exposure of pollutants to storm water at the WMSL Facility.

132.    Defendant has not developed and/or implemented BMPs at the WMSL Facility that adequately control and minimize polluted runoff from the WMSL Facility.

133.    Defendant has not developed and/or implemented BMPs at the WMSL Facility that adequately treat and remove pollutants in storm water prior to the discharge.

134.    Defendant has not developed and/or implemented adequate measures to reduce or eliminate storm water pollution that constitute BAT/BCT.

135.    Defendant has not developed and/or implemented BMPs at the WMSL Facility that adequately prevent or control contaminated storm water from being discharged at the WMSL Facility.

136.    Defendant has not developed and/or implemented BMPs at the WMSL Facility that adequately prevent or control non-storm water discharges from being discharged at the WMSL Facility.

137.    Defendant has not developed and/or implemented adequate BMPs at the WMSL Facility to achieve storm water discharges that meet EPA Benchmarks, NALs, or applicable Water Quality Standards.

138.    Defendant has not developed and/or implemented adequate BMPs at the WMSL Facility to achieve discharges that meet Effluent Limitation Guidelines.

139.    Defendant has not adequately evaluated and revised the WMSL Facility's SWPPP to address these failures.

140.    Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the WMSL Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

141.    Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

142.    Plaintiffs are informed, believe, and thereon allege that Defendant has

Complaint for Declaratory and Injunctive Relief and Civil Penalties

failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the WMSL Facility since at least May 23, 2013.

143.     Each day that Defendant has operated the WMSL Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

**D. Defendant's Monitoring Program at the WMSL Facility**

144.     From 1997 through June 30, 2015, the WMSL Facility was required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5).

145.     Sampling and analysis procedures require that a sample be taken from all discharge locations at the WMSL Facility and that at least two samples are taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. (Industrial Permit, Sections B(5) and B(7)).

146.     From June 30, 2015 through the present WMSL Facility is required to sample at least two storm events within the first half of each reporting year (July 1 to December 31) and two storm events within the second half of each reporting year (January 1 to June 30) in accordance with the sampling and analysis procedures in New Industrial Permit Section XI.B.

147.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the WMSL Facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

148.     All monitoring data must be uploaded to SMARTS within 30 days of obtaining all results for each sampling event. (New Industrial Permit, XI.B.11.a)

149.     Plaintiffs are informed, believe, and thereon allege that despite the extremely high levels of pollutants reported in the samples that were taken at the WMSL Facility, the Defendant has not sampled and submitted sampling reports as required.

150.     Plaintiffs are informed, believe, and thereon allege that Defendant has not successfully and consistently sampled and reported for aluminum, copper, selenium, dissolved oxygen, zinc, chemical oxygen demand, e. coli, enterococcus, biological oxygen demand, Ammonia (as N), α-Terpineol, Benzoic acid, p-Cresol, or Phenol as required by the Permit.

151.     Information available to Plaintiffs indicates that Defendant has not submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the WMSL Facility's noncompliance with the Industrial Permit pursuant to Section C(11)(d) of the Industrial Permit.

152.     Information available to Plaintiffs indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

**E.  Metro Biosolids Center**

153.     Plaintiffs are informed, believe, and thereon allege Defendant City of San Diego owns and operates the MBC Facility located at 5240 Convoy Street, San Diego California 92111.

154.     Plaintiffs are informed, believe, and thereon allege the MBC Facility is approximately 39 acres.

155.     Plaintiffs are informed, believe, and thereon allege that at least 3.5 acres of the MBC Facility are classified as areas of industrial activities and materials exposed to precipitation.

156.     Plaintiffs are informed, believe, and thereon allege the MBC Facility is bordered to the north by San Clemente Creek and the West Miramar Sanitary Landfill, to the east by the South Miramar Landfill, and to the south and west by Highway 52.

157.     Plaintiffs are informed, believe, and thereon allege the MBC Facility is assigned the standard industrial classifications (SIC) codes of 4952 under the category

of "Sewerage Systems."

158.    Plaintiffs are informed, believe, and thereon allege the MBC Facility is utilized for solids processing operations.

159.    Plaintiffs are informed, believe, and thereon allege various industrial materials comprised of metals, fuels, nutrients, bacteria, oils and grease, organic compounds, debris, and sediment are utilized and/or present onsite.

160.    Plaintiffs are informed, believe, and thereon allege the MBC Facility Owners and/or Operators engage in the following industrial operations: receiving raw biosolids, degritting, thickening, digesting, solids dewatering and storage, truck loading stations, odor control facilities, biogas storage tank and flares, cogeneration facilities, chemical storage facilities, pumping station, vactor truck unloading, departmental storage area, MBC Facility and equipment maintenance, repair, washing, and fueling.

161.    Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with operations at the MBC Facility include, but are not limited to: total suspended solids; oil and grease; pH-affecting substances; E. coli; total coliform; enterococcus; metals; nitrate, nitrite, and total nitrogen; fecal coliform; and ammonia as nitrogen.

162.    Plaintiffs are informed, believe, and thereon allege that many operations at the MBC Facility occur outdoors and expose pollutants to rainfall.

163.    Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the MBC Facility are exposed to storm water at the MBC Facility.

164.    Plaintiffs are informed, believe, and thereon allege activities at the MBC Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the MBC Facility. During rain events, this pollution is washed off those surfaces and into storm water discharge points, which flow to Receiving Waters.

165.    Plaintiffs are informed, believe, and thereon allege storm water is

discharged from at least two discharge points at the MBC Facility into Receiving Waters.

166.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (S*ee* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

167.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)). A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

168.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

169.     Information available to Plaintiffs indicates that each of the surface waters into which the MBC Facility discharges polluted storm water is a tributary to traditional navigable waters, such as Rose Creek, Mission Bay, and the Pacific Ocean.

170.     Plaintiffs are informed, believe, and thereon allege the MBC Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters. Elevated levels of bacteria, metals, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their beneficial uses.

171.     Water Quality Standards are pollutant concentration levels determined by

29

the State Board and the EPA to be protective of the beneficial uses of the receiving waters. Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

172.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38, ("California Toxics Rule" or "CTR") and in the Basin Plan. The CTR limits are, in part, as follows for freshwater: lead – .065 mg/L; zinc – .12 mg/L; selenium – .005 mg/L; copper – .014 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

173.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (*See* Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP) Fact Sheet, pp. 55-56). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id*., at p. 65).

174.     The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at p. 1-1). The Basin Plan identifies several beneficial uses for regional waters, including for San Clemente Creek, Rose Creek, and Mission Bay.

175.     The Basin Plan establishes the following water quality objectives for freshwater in San Clemente Creek and Rose Creek: enterococci: 61 MPN/100 mL; fecal

Complaint for Declaratory and Injunctive Relief and Civil Penalties

coliform: 400 MPN/100 mL; total coliform: 10000 MPN/100mL. The Basin Plan establishes the following water quality objectives for saltwater in Mission Bay and the Pacific Ocean: enterococci: 104 MPN/100mL.

**F. Past and Present Industrial Activity at the MBC Facility**

176.    The potential pollutant sources associated with the industrial activities at the MBC Facility include, but are not limited to: litter; landscape debris; soil erosion; dust; residue from washed off screens, pumps, and mechanical equipment; spilled and/or leaked sewage, sludge, and chemicals; leaks from vehicles; car and tire wear; grit, sludge, dirt and mud tracked from tires; leaks from pumps, valves, and mechanical equipment; residue from grinding, sanding, etc.; leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas; overspray of landscape irrigation; leachate from soils or areas of irrigated vegetation; on-site fertilizer use; cutting and sawing of concrete, FRP, metal, etc. during construction activities; uncovered construction materials; and construction debris.

177.    Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the MBC Facility therefore include but are not limited to: total suspended solids; oil and grease; pH-affecting substances; E. coli; total coliform; enterococcus; nitrate, nitrite, and total nitrogen; fecal coliform; ammonia as nitrogen; COD; and toxic metals such as copper, iron, zinc, lead, and aluminum.

178.    Plaintiffs are informed, believe, and thereon allege that some operations at the MBC Facility occur outdoors and are causing pollutants to be exposed to rainfall.

179.    Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the MBC Facility are exposed to storm water at the MBC Facility.

180.    Plaintiffs are informed, believe, and thereon allege water and other fluids from the MBC Facility's screen washing activities, landscape irrigation overspray, spilled/leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring/storing/maintaining bulk chemical areas are

discharged from the MBC Facility into Receiving Waters.

181.    Water and other fluids from the MBC Facility's screen washing activities, landscape irrigation overspray, spilled/leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring/storing/maintaining bulk chemical areas constitute unauthorized non-storm water discharges.

182.    Plaintiffs are informed, believe, and thereon allege that the MBC Facility lacks effective BMPs to control the flow of storm water from the MBC Facility into storm water conveyance systems.

183.    Plaintiffs are informed, believe, and thereon allege that the MBC Facility lacks effective BMPs to control the flow of water and other fluids from the MBC Facility's screen washing activities, landscape irrigation overspray, spilled and/or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas from the MBC Facility into storm water conveyance systems and Receiving Waters.

184.    Suspended solids, metal particles, nutrients, bacteria, and other pollutants have been and continue to be conveyed from the MBC Facility into storm drain conveyance systems and Receiving Waters.

185.    Plaintiffs are informed, believe, and thereon allege that the MBC Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the MBC Facility.

**G. The MBC Facility and its Associated Discharge of Pollutants**

186.    Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the MBC Facility discharges polluted storm water from the industrial activities at the MBC Facility via storm drainage systems and into the Receiving Waters.

187.    Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the MBC Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit properly regulates discharges to those

waters.

188.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the MBC Facility has exceeded the Basin Plan water quality objective for boron. For example, Defendant's 2016-2017 monitoring data indicates exceedance levels of boron at 24.6 mg/L, which is over 33 times the Basin Plan water quality objective for boron of 0.75 mg/L (*See* Basin Plan at p. 3-2).

189.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the MBC Facility has exceeded the Basin Plan water quality objective for E. coli. For example, Defendant's 2016-2017 monitoring data indicates exceedance levels of E. coli at 19350 MPN/100mL, which is over 82 times the Basin Plan water quality objective for E. coli of 235 MPN/100mL (*See* Basin Plan at p. 3-7).

190.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the MBC Facility has exceeded the Basin Plan water quality objective for fecal coliform. For example, Defendant's 2016-2017 monitoring data indicates exceedance levels of fecal coliform at 7900 MPN/100mL, which is over 20 times the Basin Plan water quality objective for fecal coliform of 400 MPN/100mL (*See* Basin Plan at p. 3-7).

191.    Plaintiffs are informed, believe, and thereon allege that storm water discharged from the MBC Facility has exceeded the Basin Plan water quality objective for total coliform. For example, Defendant's 2016-2017 monitoring data indicates exceedance levels of total coliform at 122300 MPN/100mL, which is over 12 times the Basin Plan water quality objective for total coliform of 10000 MPN/100mL (*See* Basin Plan at p. 3-7).

192.    Plaintiffs are informed, believe, and thereon allege that during every significant rain event that has occurred at the MBC Facility since May 23, 2013 through the present, Defendant has discharged and continues to discharge storm water from the MBC Facility that contains pollutants at levels in violation of the prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality

Standards.

193.    Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the MBC Facility.

194.    The inadequacy of the BMPs at the MBC Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP.

195.    Storm water discharges from the MBC Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

196.    Plaintiffs are informed, believe, and thereon allege that since at least May 23, 2013 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT and Effluent Limitation Guidelines at the MBC Facility.

197.    Plaintiffs are informed, believe, and thereon allege MBC Facility's repeated exceedances of EPA Benchmarks and applicable Water Quality Standards over the past five years for pollutants, including aluminum, boron, iron, total suspended solids, total coliform, fecal coliform, enterococci, and pH-affecting substances, indicate that the MBC Facility has failed and continues to fail to meet BAT/BCT.

198.    Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

199.    Based on their investigation of the MBC Facility, Plaintiffs are informed and believe that Defendant has failed to develop and implement an adequate SWPPP since at least May 23, 2013 through the present.

200.    Defendant has not developed and/or implemented BMPs to adequately minimize the exposure of pollutants to storm water at the MBC Facility.

201.    Defendant has not developed and/or implemented BMPs at the MBC Facility that adequately control and minimize polluted runoff from the MBC Facility.

202.    Defendant has not developed and/or implemented BMPs at the MBC Facility that adequately treat and remove pollutants in storm water prior to the discharge.

203.    Defendant has not developed and/or implemented adequate measures to reduce or eliminate storm water pollution that constitute BAT/BCT.

204.    Defendant has not developed and/or implemented BMPs at the MBC Facility that adequately prevent or control contaminated storm water from being discharged at the MBC Facility.

205.    Defendant has not developed and/or implemented BMPs at the MBC Facility that adequately prevent or control non-storm water discharges from being discharged at the MBC Facility.

206.    Defendant has not developed and/or implemented adequate BMPs at the MBC Facility to achieve storm water discharges that meet EPA Benchmarks, NALs, or applicable Water Quality Standards.

207.    Defendant has not developed and/or implemented adequate BMPs at the MBC Facility to achieve discharges that meet Effluent Limitation Guidelines.

208.    Defendant has not adequately evaluated and revised the MBC Facility's SWPPP to address these failures.

209.    Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the MBC Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

210.    Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

211.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the MBC Facility since at least May 23, 2013.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

212.     Each day that Defendant has operated the MBC Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

**H. Defendant's Monitoring Program at the MBC Facility**

213.     From 1997 through June 30, 2015, the MBC Facility was required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5).

214.     Sampling and analysis procedures require that a sample be taken from all discharge locations at the MBC Facility and that at least two samples are taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. (Industrial Permit, Sections B(5) and B(7)).

215.     From June 30, 2015 through the present MBC Facility is required to sample at least two storm events within the first half of each reporting year (July 1 to December 31) and two storm events within the second half of each reporting year (January 1 to June 30) in accordance with the sampling and analysis procedures in New Industrial Permit Section XI.B.

216.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the MBC Facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

217.     All monitoring data must be uploaded to SMARTS within 30 days of obtaining all results for each sampling event. (New Industrial Permit, XI.B.11.a)

218.     Plaintiffs are informed, believe, and thereon allege that despite the extremely high levels of pollutants reported in the samples that were taken at the MBC Facility, the Defendant has not sampled and submitted sampling reports as required.

219.     Plaintiffs are informed, believe, and thereon allege that Defendant has not successfully and consistently sampled and reported for copper, nutrients, chemical oxygen demand, and metals as required by the Permit.

220.     Information available to Plaintiffs indicates that Defendant has not submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the MBC Facility's noncompliance with the Industrial Permit pursuant to Section C(11)(d) of the Industrial Permit.

**221.**     Information available to Plaintiffs indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

**I.  Point Loma Wastewater Treatment Plant**

222.     Plaintiffs are informed, believe, and thereon allege Defendant City of San Diego owns and operates the PLWWTP Facility located at 1902 Gatchell Road, San Diego California 92106.

223.     Plaintiffs are informed, believe, and thereon allege the PLWWTP Facility is approximately 40 acres.

224.     Plaintiffs are informed, believe, and thereon allege that at least 2 acres of the PLWWTP Facility are classified as areas of industrial activities and materials exposed to precipitation.

225.     Plaintiffs are informed, believe, and thereon allege the PLWWTP Facility is assigned the standard industrial classifications (SIC) codes of 4952 under the category of "Sewerage Systems."

226.     Plaintiffs are informed, believe, and thereon allege the PLWWTP Facility is utilized for wastewater treatment operations.

227.     Plaintiffs are informed, believe, and thereon allege various industrial materials comprised of metals, fuels, nutrients, bacteria, oils and grease, organic compounds, debris, and sediment are utilized and/or present onsite.

228.      Plaintiffs are informed, believe, and thereon allege the PLWWTP Facility Owners and/or Operators engage in the following industrial operations: wastewater

treatment operations, including initial screening, bar screens, grit removal, ferric chloride and polymer addition, sedimentation and clarification activities, a headworks area, sedimentation facilities, outfall structures, solids handling facilities, a gas collection system, two power generation facilities (a gas utilization facility and a hydroelectric power facility), a beneficial use of digester gas (BUDG) facility, odor control facilities, chemical storage facilities, maintenance facilities, a paint shop, engineering facilities, and an operations building and visitors' center.

229.    Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with operations at the PLWWTP Facility include, but are not limited to: total suspended solids; pH-affecting substances; oil and grease; E. coli; total coliform; enterococcus; metals; nitrate, nitrite, and total nitrogen; fecal coliform; and ammonia as nitrogen.

230.    Plaintiffs are informed, believe, and thereon allege that many operations at the PLWWTP Facility occur outdoors and expose pollutants to rainfall.

231.    Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the PLWWTP Facility are exposed to storm water at the PLWWTP Facility.

232.    Plaintiffs are informed, believe, and thereon allege activities at the PLWWTP Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the PLWWTP Facility. During rain events, this pollution is washed off those surfaces and into storm water discharge points, which flow to Receiving Waters.

233.    Plaintiffs are informed, believe, and thereon allege storm water is discharged from at least four discharge points at the PLWWTP Facility into Receiving Waters.

234.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (See 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters

but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

235.     Information available to Plaintiffs indicates that each of the four outfall pipes into which the PLWWTP Facility discharges polluted storm water discharges to a traditional navigable waterbody, the Pacific Ocean near Cabrillo National Monument.

236.     Plaintiffs are informed, believe, and thereon allege the PLWWTP Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters. Elevated levels of bacteria and other pollutants have resulted in the inability of Receiving Waters to support their beneficial uses.

237.     Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the Receiving Waters. Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

238.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38, ("California Toxics Rule" or "CTR") and in the Ocean Plan. The CTR limits are, in part, for saltwater: copper – .0048 mg/L; zinc – .09 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

239.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (*See* Multi-Sector General Permits for Stormwater Discharges Associated with Industrial

Complaint for Declaratory and Injunctive Relief and Civil Penalties

Activity (MSGP) Fact Sheet, pp. 55-56). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id.*, at p. 65).

240.     The California State Water Resources Control Board's Ocean Plan establishes water quality objectives, implementation plans for point source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all state ocean waters. (*See generally* Ocean Plan Introduction). The Ocean Plan identifies several beneficial uses for ocean waters, including the Pacific Ocean near Cabrillo National Monument.

241.     The Ocean Plan establishes the following water quality objectives for coastal ocean waters, water contact recreation areas, and kelp beds: enterococci: 104 MPN/100 ml; fecal coliform: 400 MPN/100 mL; total coliform: 10000 MPN/100 ml. (Ocean Plan, Section II.B.1.a.1.).

**J.  Past and Present Industrial Activity at the PLWWTP Facility**

242.     The potential pollutant sources associated with the industrial activities at the PLWWTP Facility include, but are not limited to: litter; landscape debris; soil erosion; dust; residue from washed off screens, pumps, and mechanical equipment; spilled/leaked sewage, sludge, and chemicals; leaks from vehicles; car and tire wear; grit and sludge tracked from tires; leaks from pumps, valves, and mechanical equipment; leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas; overspray of landscape irrigation; leachate from soils or areas of irrigated vegetation; on-site fertilizer use; cutting and sawing of concrete, FRP, metal, etc. during construction activities; uncovered construction materials; and construction debris.

243.     Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the PLWWTP Facility therefore include but are not

limited to: total suspended solids; oil and grease; pH-affecting substances; E. coli; total coliform; enterococcus; nitrate, nitrite, and total nitrogen; fecal coliform; ammonia as nitrogen; COD; and toxic metals such as copper, iron, zinc, lead, and aluminum.

244.    Plaintiffs are informed, believe, and thereon allege that some operations at the PLWWTP Facility occur outdoors and are causing pollutants to be exposed to rainfall.

245.    Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the PLWWTP Facility are exposed to storm water at the PLWWTP Facility.

246.    Plaintiffs are informed, believe, and thereon allege water and other fluids from the PLWWTP Facility's screen washing activities, landscape irrigation overspray, spilled or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas are discharged from the PLWWTP Facility into Receiving Waters.

247.    Water and other fluids from the PLWWTP Facility's screen washing activities, landscape irrigation overspray, spilled or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas constitute unauthorized non-storm water discharges.

248.    Plaintiffs are informed, believe, and thereon allege that the PLWWTP Facility lacks effective BMPs to control the flow of storm water from the PLWWTP Facility into storm water conveyance systems.

249.    Plaintiffs are informed, believe, and thereon allege that the PLWWTP Facility lacks effective BMPs to control the flow of water and other fluids from the PLWWTP Facility's screen washing activities, landscape irrigation overspray, spilled and/or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas from the PLWWTP Facility into storm water conveyance systems and Receiving

Complaint for Declaratory and Injunctive Relief and Civil Penalties

Waters.

250.     Suspended solids, metal particles, nutrients, bacteria, and other pollutants have been and continue to be conveyed from the PLWWTP Facility into storm drain conveyance systems and Receiving Waters.

251.     Plaintiffs are informed, believe, and thereon allege that the PLWWTP Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the PLWWTP Facility.

**K. The PLWWTP Facility and its Associated Discharge of Pollutants**

252.     Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the PLWWTP Facility discharges polluted storm water from the industrial activities at the PLWWTP Facility via storm drainage systems and into the Receiving Waters.

253.     Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the PLWWTP Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit properly regulates discharges to those waters.

254.     Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PLWWTP Facility has exceeded the Basin Plan water quality objective for fecal coliform. For example, Defendant's 2014-2015 monitoring data indicates exceedance levels of fecal coliform at 3,500 MPN/100mL, which is almost 9 times the Ocean Plan water quality objective for fecal coliform of 400 MPN/100mL (*See* Ocean Plan at II.B.1.a.1.).

255.     Plaintiffs are informed, believe, and thereon allege that storm water discharged from the PLWWTP Facility has exceeded the Ocean Plan water quality objective for total coliform. For example, Defendant's 2016-2017 monitoring data indicates exceedance levels of total coliform at 307,600 MPN/100mL, which is over 30 times the Basin Plan water quality objective for total coliform of 10000 MPN/100mL. (*See* Ocean Plan at II.B.1.a.1.).

256.     Plaintiffs are informed, believe, and thereon allege that during every significant rain event that has occurred at the PLWWTP Facility since May 23, 2013 through the present, Defendant has discharged and continues to discharge storm water from the PLWWTP Facility that contains pollutants at levels in violation of the prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

257.     Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the PLWWTP Facility.

258.     The inadequacy of the BMPs at the PLWWTP Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP.

259.     Storm water discharges from the PLWWTP Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

260.     Plaintiffs are informed, believe, and thereon allege that since at least May 23, 2013 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT and Effluent Limitation Guidelines at the PLWWTP Facility.

261.     Plaintiffs are informed, believe, and thereon allege PLWWTP Facility's repeated exceedances of EPA Benchmarks and applicable Water Quality Standards over the past five years for pollutants, including total suspended solids, total coliform, fecal coliform, E. coli, and pH-affecting substances, indicate that the PLWWTP Facility has failed and continues to fail to meet BAT/BCT.

262.     Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

263.     Based on their investigation of the PLWWTP Facility, Plaintiffs are informed and believe that Defendant has failed to develop and implement an adequate SWPPP since at least May 23, 2013 through the present.

264.     Defendant has not developed and/or implemented BMPs to adequately minimize the exposure of pollutants to storm water at the PLWWTP Facility.

265.     Defendant has not developed and/or implemented BMPs at the PLWWTP Facility that adequately control and minimize polluted runoff from the PLWWTP Facility.

266.     Defendant has not developed and/or implemented BMPs at the PLWWTP Facility that adequately treat and remove pollutants in storm water prior to the discharge.

267.     Defendant has not developed and/or implemented adequate measures to reduce or eliminate storm water pollution that constitute BAT/BCT.

268.     Defendant has not developed and/or implemented BMPs at the PLWWTP Facility that adequately prevent or control contaminated storm water from being discharged at the PLWWTP Facility.

269.     Defendant has not developed and/or implemented BMPs at the PLWWTP Facility that adequately prevent or control non-storm water discharges from being discharged at the PLWWTP Facility.

270.     Defendant has not developed and/or implemented adequate BMPs at the PLWWTP Facility to achieve storm water discharges that meet EPA Benchmarks, NALs, or applicable Water Quality Standards.

271.     Defendant has not developed and/or implemented adequate BMPs at the PLWWTP Facility to achieve discharges that meet Effluent Limitation Guidelines.

272.     Defendant has not adequately evaluated and revised the PLWWTP Facility's SWPPP to address these failures.

273.     Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the PLWWTP Facility to achieve compliance

with the Industrial Stormwater Permit and its SWPPP requirements.

274.    Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

275.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the PLWWTP Facility since at least May 23, 2013.

276.    Each day that Defendant has operated the PLWWTP Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

**L. Defendant's Monitoring Program at the PLWWTP Facility**

277.    From 1997 through June 30, 2015, the PLWWTP Facility was required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5).

278.    Sampling and analysis procedures require that a sample be taken from all discharge locations at the PLWWTP Facility and that at least two samples are taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. (Industrial Permit, Sections B(5) and B(7)).

279.    From June 30, 2015 through the present PLWWTP Facility is required to sample at least two storm events within the first half of each reporting year (July 1 to December 31) and two storm events within the second half of each reporting year (January 1 to June 30) in accordance with the sampling and analysis procedures in New Industrial Permit Section XI.B.

280.    Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the PLWWTP Facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

281.    All monitoring data must be uploaded to SMARTS within 30 days of

obtaining all results for each sampling event. (New Industrial Permit, XI.B.11.a)

282.    Plaintiffs are informed, believe, and thereon allege that despite the extremely high levels of pollutants reported in the samples that were taken at the PLWWTP Facility, the Defendant has not sampled and submitted sampling reports as required.

283.    Plaintiffs are informed, believe, and thereon allege that Defendant has not successfully and consistently sampled and reported for nutrients, sewage, fertilizers, bacteria, dissolved minerals, total suspended solids, pH-affecting substances, oil and grease, dissolved oxygen, and metals, such as copper, lead, zinc, aluminum, and iron, as required by the Permit.

284.    Information available to Plaintiffs indicates that Defendant has not submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the PLWWTP Facility's noncompliance with the Industrial Permit pursuant to Section C(11)(d) of the Industrial Permit.

285.    Information available to Plaintiffs indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

**M. South Bay Water Reclamation Plant**

286.    Plaintiffs are informed, believe, and thereon allege Defendant City of San Diego owns and operates the SBWRP Facility located at 2411 Dairy Mart Road, San Diego California 92154.

287.    Plaintiffs are informed, believe, and thereon allege the SBWRP Facility is approximately 22.3 acres.

288.    Plaintiffs are informed, believe, and thereon allege that at least 1 acre of the SBWRP Facility is classified as area of industrial activities and materials exposed to precipitation.

46

289.    Plaintiffs are informed, believe, and thereon allege the SBWRP Facility is bordered to the north by Dairy Mart Road and Clearwater Way, to the west and south by Monument Road, and to the east by the South Bay International Wastewater Treatment Plant.

290.    Plaintiffs are informed, believe, and thereon allege the SBWRP Facility is assigned the standard industrial classifications (SIC) codes of 4952 under the category of "Sewerage Systems."

291.    Plaintiffs are informed, believe, and thereon allege the SBWRP Facility is utilized for wastewater treatment operations.

292.    Plaintiffs are informed, believe, and thereon allege various industrial materials comprised of metals, fuels, nutrients, bacteria, oils and grease, organic compounds, debris, and sediment are utilized and/or present onsite.

293.    Plaintiffs are informed, believe, and thereon allege the SBWRP Facility Owners and/or Operators engage in the following industrial operations: influent screening and grit removal, primary sedimentation, primary scum flotation and collection, primary scum pumping, primary effluent sampling, flow equalization, biological treatment, secondary clarification, tertiary treatment, a chemical storage facility, odor control facilities, an emergency power generation system, a fuel cell facility, and SBWRP Facility equipment maintenance, repair, and washing.

294.    Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with operations at the SBWRP Facility include, but are not limited to: total suspended solids; pH-affecting substances; oil and grease; E. coli; total coliform; enterococcus; metals; nitrate, nitrite, and total nitrogen; fecal coliform; and ammonia as nitrogen.

295.    Plaintiffs are informed, believe, and thereon allege that many operations at the SBWRP Facility occur outdoors and expose pollutants to rainfall.

296.    Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the SBWRP Facility are exposed to storm water

at the SBWRP Facility.

297.   Plaintiffs are informed, believe, and thereon allege activities at the SBWRP Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the SBWRP Facility. During rain events, this pollution is washed off those surfaces and into storm water discharge points, which flow to Receiving Waters.

298.   Plaintiffs are informed, believe, and thereon allege storm water is discharged from at least two discharge points at the SBWRP Facility into Receiving Waters.

299.   The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (S*ee* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

300.   The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)). A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

301.   A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

302.   Information available to Plaintiffs indicates that each of the surface waters into which the SBWRP Facility discharges polluted storm water is a tributary to

traditional navigable waters, such as the Tijuana River, the Tijuana River Estuary, and the Pacific Ocean.

303.     Plaintiffs are informed, believe, and thereon allege the SBWRP Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters. Elevated levels of bacteria, sedimentation, and other pollutants have resulted in the inability of Receiving Waters to support their beneficial uses.

304.     Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the receiving waters. Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

305.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38, ("California Toxics Rule" or "CTR") and in the Basin Plan. The CTR limits are, in part, as follows for freshwater: lead – .065 mg/L; zinc – .12 mg/L; selenium – .005 mg/L; copper – .014 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

306.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (*See* Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP) Fact Sheet, pp. 55-56). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id*., at p. 65).

307.     The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at p. 1-1). The Basin Plan identifies several beneficial uses for regional waters, including the Tijuana River and the Tijuana River Estuary.

308.     The Basin Plan establishes the following water quality objectives for freshwater in the Tijuana River: enterococci: 61 MPN/100mL; fecal coliform: 400 MPN/100 mL; total coliform: 10000 MPN/100mL. The Basin Plan establishes the following water quality objectives for saltwater in the Tijuana River Estuary and the Pacific Ocean: enterococci: 104 MPN/100mL.

**N. Past and Present Industrial Activity at the SBWRP Facility**

309.     The potential pollutant sources associated with the industrial activities at the SBWRP Facility include, but are not limited to: litter; landscape debris; soil erosion; dust; residue from washed off screens, pumps, and mechanical equipment; spilled/leaked sewage, sludge, and chemicals; leaks from vehicles; car and tire wear; grit and sludge tracked from tires; leaks from pumps, valves, and mechanical equipment; residue from grinding, sanding, etc.; leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas; overspray of landscape irrigation; leachate from soils or areas of irrigated vegetation; on-site fertilizer use; cutting and sawing of concrete, FRP, metal, etc. during construction activities; uncovered construction materials; and construction debris.

310.     Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the SBWRP Facility therefore include but are not limited to: total suspended solids; oil and grease; pH-affecting substances; E. coli; total coliform; enterococcus; nitrate, nitrite, and total nitrogen; fecal coliform; ammonia as nitrogen; COD; and toxic metals such as copper, iron, zinc, lead, and aluminum.

311.     Plaintiffs are informed, believe, and thereon allege that some operations at

the SBWRP Facility occur outdoors and are causing pollutants to be exposed to rainfall.

312.   Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the SBWRP Facility are exposed to storm water at the SBWRP Facility.

313.   Plaintiffs are informed, believe, and thereon allege water and other fluids from the SBWRP Facility's screen washing activities, landscape irrigation overspray, spilled or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas are discharged from the SBWRP Facility into Receiving Waters.

314.   Water and other fluids from the SBWRP Facility's screen washing activities, landscape irrigation overspray, spilled or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas constitute unauthorized non-storm water discharges.

315.   Plaintiffs are informed, believe, and thereon allege that the SBWRP Facility lacks effective BMPs to control the flow of storm water from the SBWRP Facility into storm water conveyance systems.

316.   Plaintiffs are informed, believe, and thereon allege that the SBWRP Facility lacks effective BMPs to control the flow of water and other fluids from the SBWRP Facility's screen washing activities, landscape irrigation overspray, spilled and/or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas from the SBWRP Facility into storm water conveyance systems and Receiving Waters.

317.   Suspended solids, metal particles, nutrients, bacteria, and other pollutants have been and continue to be conveyed from the SBWRP Facility into storm drain conveyance systems and Receiving Waters.

318.   Plaintiffs are informed, believe, and thereon allege that the SBWRP Facility pollution control measures are ineffective in controlling the exposure of

pollutant sources to storm water at the SBWRP Facility.

**O. The SBWRP Facility and its Associated Discharge of Pollutants**

319.     Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the SBWRP Facility discharges polluted storm water from the industrial activities at the SBWRP Facility via storm drainage systems and into the Receiving Waters.

320.     Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the SBWRP Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit properly regulates discharges to those waters.

321.     Plaintiffs are informed, believe, and thereon allege that storm water discharged from the SBWRP Facility has exceeded the Basin Plan water quality objective for E. coli. For example, Defendant's 2017-2018 monitoring data indicates exceedance levels of E. coli at 27,550 MPN/100mL, which is over 117 times the Basin Plan water quality objective for E. coli of 235 MPN/100mL (*See* Basin Plan at p. 3-7).

322.     Plaintiffs are informed, believe, and thereon allege that storm water discharged from the SBWRP Facility has exceeded the Basin Plan water quality objective for fecal coliform. For example, Defendant's 2013-2014 monitoring data indicates exceedance levels of fecal coliform at 7900 MPN/100mL, which is over 19 times the Basin Plan water quality objective for fecal coliform of 400 MPN/100mL (*See* Basin Plan at p. 3-7).

323.     Plaintiffs are informed, believe, and thereon allege that storm water discharged from the SBWRP Facility has exceeded the Basin Plan water quality objective for total coliform. For example, Defendant's 2016-2017 monitoring data indicates exceedance levels of total coliform at 1,119,900 MPN/100mL, which is approximately 112 times the Basin Plan water quality objective for total coliform of 10000 MPN/100mL (*See* Basin Plan at p. 3-7).

324.     Plaintiffs are informed, believe, and thereon allege that during every

significant rain event that has occurred at the SBWRP Facility since May 23, 2013 through the present, Defendant has discharged and continues to discharge storm water from the SBWRP Facility that contains pollutants at levels in violation of the prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

325.    Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the SBWRP Facility.

326.    The inadequacy of the BMPs at the SBWRP Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP.

327.    Storm water discharges from the SBWRP Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

328.    Plaintiffs are informed, believe, and thereon allege that since at least May 23, 2013 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT and Effluent Limitation Guidelines at the SBWRP Facility.

329.    Plaintiffs are informed, believe, and thereon allege SBWRP Facility's repeated exceedances of EPA Benchmarks and applicable Water Quality Standards over the past five years for pollutants, including total suspended solids, total coliform, fecal coliform, E. coli, and oil and grease, indicate that the SBWRP Facility has failed and continues to fail to meet BAT/BCT.

330.    Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

331.    Based on their investigation of the SBWRP Facility, Plaintiffs are

informed and believe that Defendant has failed to develop and implement an adequate SWPPP since at least May 23, 2013 through the present.

332.     Defendant has not developed and/or implemented BMPs to adequately minimize the exposure of pollutants to storm water at the SBWRP Facility.

333.     Defendant has not developed and/or implemented BMPs at the SBWRP Facility that adequately control and minimize polluted runoff from the SBWRP Facility.

334.     Defendant has not developed and/or implemented BMPs at the SBWRP Facility that adequately treat and remove pollutants in storm water prior to the discharge.

335.     Defendant has not developed and/or implemented adequate measures to reduce or eliminate storm water pollution that constitute BAT/BCT.

336.     Defendant has not developed and/or implemented BMPs at the SBWRP Facility that adequately prevent or control contaminated storm water from being discharged at the SBWRP Facility.

337.     Defendant has not developed and/or implemented BMPs at the SBWRP Facility that adequately prevent or control non-storm water discharges from being discharged at the SBWRP Facility.

338.     Defendant has not developed and/or implemented adequate BMPs at the SBWRP Facility to achieve storm water discharges that meet EPA Benchmarks, NALs, or applicable Water Quality Standards.

339.     Defendant has not developed and/or implemented adequate BMPs at the SBWRP Facility to achieve discharges that meet Effluent Limitation Guidelines.

340.     Defendant has not adequately evaluated and revised the SBWRP Facility's SWPPP to address these failures.

341.     Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the SBWRP Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

342.     Each day that Defendant has failed and continues to fail to implement an

adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

343.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the SBWRP Facility since at least May 23, 2013.

344.    Each day that Defendant has operated the SBWRP Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

**P. Defendant's Monitoring Program at the SBWRP Facility**

345.    From 1997 through June 30, 2015, the SBWRP Facility was required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5).

346.    Sampling and analysis procedures require that a sample be taken from all discharge locations at the SBWRP Facility and that at least two samples are taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. (Industrial Permit, Sections B(5) and B(7)).

347.    From June 30, 2015 through the present SBWRP Facility is required to sample at least two storm events within the first half of each reporting year (July 1 to December 31) and two storm events within the second half of each reporting year (January 1 to June 30) in accordance with the sampling and analysis procedures in New Industrial Permit Section XI.B.

348.    Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the SBWRP Facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

349.    All monitoring data must be uploaded to SMARTS within 30 days of obtaining all results for each sampling event. (New Industrial Permit, XI.B.11.a)

350.    Plaintiffs are informed, believe, and thereon allege that despite the

extremely high levels of pollutants reported in the samples that were taken at the SBWRP Facility, the Defendant has not sampled and submitted sampling reports as required.

351. Plaintiffs are informed, believe, and thereon allege that Defendant has not successfully and consistently sampled and reported for nutrients; fertilizers; total suspended solids; pH-affecting substances; oil and grease; E. coli; total coliform; enterococcus; metals; nitrate, nitrite, and total nitrogen; fecal coliform; and ammonia as nitrogen, as required by the Permit.

352. Information available to Plaintiffs indicates that Defendant has not submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the SBWRP Facility's noncompliance with the Industrial Permit pursuant to Section C(11)(d) of the Industrial Permit.

353. Information available to Plaintiffs indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

**Q. North City Water Reclamation Plant**

354. Plaintiffs are informed, believe, and thereon allege Defendant City of San Diego owns and operates the NCWRP Facility located at 4949 Eastgate Mall, San Diego California 92121.

355. Plaintiffs are informed, believe, and thereon allege the NCWRP Facility is approximately 34 acres.

356. Plaintiffs are informed, believe, and thereon allege that at least 0.5 acres of the NCWRP Facility are classified as areas of industrial activities and materials exposed to precipitation.

357. Plaintiffs are informed, believe, and thereon allege the NCWRP Facility is bordered to the north by Eastgate Mall Road, to the east by undeveloped land, to the

Complaint for Declaratory and Injunctive Relief and Civil Penalties

south by Miramar Road, and to the west by Interstate 805.

358.    Plaintiffs are informed, believe, and thereon allege the NCWRP Facility is assigned the standard industrial classifications (SIC) codes of 4952 under the category of "Sewerage Systems."

359.    Plaintiffs are informed, believe, and thereon allege the NCWRP Facility is utilized for wastewater treatment operations.

360.    Plaintiffs are informed, believe, and thereon allege various industrial materials comprised of metals, fuels, nutrients, bacteria, oils and grease, organic compounds, debris, and sediment are utilized and/or present onsite.

361.     Plaintiffs are informed, believe, and thereon allege the NCWRP Facility Owners and/or Operators engage in the following industrial operations: influent screening and grit removal, primary sedimentation, flow equalization, biological treatment, secondary clarification, tertiary treatment, demineralization, chlorination, a chemical storage facility, odor control facilities, a co-generation facility, and NCWRP Facility and equipment maintenance, repair, and washing.

362.    Plaintiffs are informed, believe, and thereon allege, that the pollutants associated with operations at the NCWRP Facility include, but are not limited to: total suspended solids; pH-affecting substances; oil and grease; E. coli; total coliform; enterococcus; metals; nitrate, nitrite, and total nitrogen; fecal coliform; and ammonia as nitrogen.

363.    Plaintiffs are informed, believe, and thereon allege that many operations at the NCWRP Facility occur outdoors and expose pollutants to rainfall.

364.    Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the NCWRP Facility are exposed to storm water at the NCWRP Facility.

365.    Plaintiffs are informed, believe, and thereon allege activities at the NCWRP Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the NCWRP Facility. During rain events, this

pollution is washed off those surfaces and into storm water discharge points, which flow to Receiving Waters.

366.   Plaintiffs are informed, believe, and thereon allege storm water is discharged from at least two discharge points at the NCWRP Facility into Receiving Waters.

367.   The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (S*ee* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

368.   The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)). A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

369.   A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

370.   Information available to Plaintiffs indicates that each of the surface waters into which the NCWRP Facility discharges polluted storm water is a tributary to traditional navigable waters, such as Rose Creek, Mission Bay, and the Pacific Ocean.

371.   Plaintiffs are informed, believe, and thereon allege the NCWRP Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in Receiving Waters. Elevated levels of bacteria, sedimentation, and other

pollutants have resulted in the inability of Receiving Waters to support their beneficial uses.

372.    Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the receiving waters. Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

373.    The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38, ("California Toxics Rule" or "CTR") and in the Basin Plan. The CTR limits are, in part, as follows for freshwater: lead – .065 mg/L; zinc – .12 mg/L; selenium – .005 mg/L; copper – .014 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

374.    EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (*See* Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP) Fact Sheet, pp. 55-56). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id*., at p. 65).

375.    The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at p. 1-1). The Basin Plan

identifies several beneficial uses for regional waters, including Rose Creek and Mission Bay.

376.     The Basin Plan establishes the following water quality objectives for freshwater in Rose Creek: enterococci: 61 MPN/100 mL; fecal coliform: 400 MPN/100 mL; total coliform: 10000 MPN/100mL. The Basin Plan establishes the following water quality objectives for saltwater in Mission Bay and the Pacific Ocean: enterococci: 104 MPN/100mL.

**R. Past and Present Industrial Activity at the NCWRP Facility**

377.     The potential pollutant sources associated with the industrial activities at the NCWRP Facility include, but are not limited to: litter; landscape debris; soil erosion; dust; residue from washed off screens, pumps, and mechanical equipment; spilled/leaked sewage, sludge, and chemicals; leaks from vehicles; car and tire wear; grit and sludge tracked from tires; leaks from pumps, valves, and mechanical equipment; residue from grinding, sanding, etc.; leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas; overspray of landscape irrigation; leachate from soils or areas of irrigated vegetation; on-site fertilizer use; cutting and sawing of concrete, FRP, metal, etc. during construction activities; uncovered construction materials; and construction debris.

378.     Plaintiffs are informed, believe, and thereon allege that pollutants present in storm water discharged from the NCWRP Facility therefore include but are not limited to: total suspended solids; oil and grease; pH-affecting substances; E. coli; total coliform; enterococcus; nitrate, nitrite, and total nitrogen; fecal coliform; ammonia as nitrogen; COD; and toxic metals such as copper, iron, zinc, lead, and aluminum.

379.     Plaintiffs are informed, believe, and thereon allege that some operations at the NCWRP Facility occur outdoors and are causing pollutants to be exposed to rainfall.

380.     Plaintiffs are informed, believe, and thereon allege particulates from operations and pollutants generated at the NCWRP Facility are exposed to storm water at the NCWRP Facility.

381.    Plaintiffs are informed, believe, and thereon allege water and other fluids from the NCWRP Facility's screen washing activities, landscape irrigation overspray, spilled or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas are discharged from the NCWRP Facility into Receiving Waters.

382.    Water and other fluids from the NCWRP Facility's screen washing activities, landscape irrigation overspray, spilled or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas constitute unauthorized non-storm water discharges.

383.    Plaintiffs are informed, believe, and thereon allege that the NCWRP Facility lacks effective BMPs to control the flow of storm water from the NCWRP Facility into storm water conveyance systems.

384.    Plaintiffs are informed, believe, and thereon allege that the NCWRP Facility lacks effective BMPs to control the flow of water and other fluids from the NCWRP Facility's screen washing activities, landscape irrigation overspray, spilled and/or leaked sewage, sludge, and chemicals, leaks from vehicles, and leaks from industrial activities when transferring, storing, and/or maintaining bulk chemical areas from the NCWRP Facility into storm water conveyance systems and Receiving Waters.

385.    Suspended solids, metal particles, nutrients, bacteria, and other pollutants have been and continue to be conveyed from the NCWRP Facility into storm drain conveyance systems and Receiving Waters.

386.    Plaintiffs are informed, believe, and thereon allege that the NCWRP Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the NCWRP Facility.

**S. The NCWRP Facility and its Associated Discharge of Pollutants**

387.    Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the NCWRP Facility discharges polluted storm water from the

1  industrial activities at the NCWRP Facility via storm drainage systems and into the

2  Receiving Waters.

3      388.    Plaintiffs are informed, believe, and thereon allege that the Receiving

4  Waters into which the NCWRP Facility discharges polluted storm water are waters of

5  the United States and therefore the Industrial Permit properly regulates discharges to

6  those waters.

7      389.    Plaintiffs are informed, believe, and thereon allege that storm water

8  discharged from the NCWRP Facility has exceeded the Basin Plan water quality

9  objective for E. coli. For example, Defendant's 2015-2016 monitoring data indicates

10 exceedance levels of E. coli at 1220 MPN/100mL, which is over 5 times the Basin Plan

11 water quality objective for E. coli of 235 MPN/100mL (*See* Basin Plan at p. 3-7).

12     390.    Plaintiffs are informed, believe, and thereon allege that storm water

13 discharged from the NCWRP Facility has exceeded the Basin Plan water quality

14 objective for fecal coliform. For example, Defendant's 2013-2014 monitoring data

15 indicates exceedance levels of fecal coliform at 1700 MPN/100mL, which is over 4

16 times the Basin Plan water quality objective for fecal coliform of 400 MPN/100mL (*See*

17 Basin Plan at p. 3-7).

18     391.    Plaintiffs are informed, believe, and thereon allege that storm water

19 discharged from the NCWRP Facility has exceeded the Basin Plan water quality

20 objective for total coliform. For example, Defendant's 2016-2017 monitoring data

21 indicates exceedance levels of total coliform at 137600 MPN/100mL, which is over 14

22 times the Basin Plan water quality objective for total coliform of 10000 MPN/100mL

23 (*See* Basin Plan at p. 3-7).

24     392.    Plaintiffs are informed, believe, and thereon allege that during every

25 significant rain event that has occurred at the NCWRP Facility since May 23, 2013

26 through the present, Defendant has discharged and continues to discharge storm water

27 from the NCWRP Facility that contains pollutants at levels in violation of the

28 prohibitions and limitations set forth in the Industrial Permit and other applicable Water

Complaint for Declaratory and Injunctive Relief and Civil Penalties

Quality Standards.

393.    Plaintiffs are informed, believe, and thereon allege, from visual observations, sample results, and investigations available to Plaintiffs, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the NCWRP Facility.

394.    The inadequacy of the BMPs at the NCWRP Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP.

395.    Storm water discharges from the NCWRP Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

396.    Plaintiffs are informed, believe, and thereon allege that since at least May 23, 2013 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT and Effluent Limitation Guidelines at the NCWRP Facility.

397.    Plaintiffs are informed, believe, and thereon allege NCWRP Facility's repeated exceedances of EPA Benchmarks and applicable Water Quality Standards over the past five years for pollutants, including total suspended solids, total coliform, fecal coliform, enterococci, E. coli, and pH-affecting substances, indicate that the NCWRP Facility has failed and continues to fail to meet BAT/BCT.

398.    Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

399.    Based on their investigation of the NCWRP Facility, Plaintiffs are informed and believe that Defendant has failed to develop and implement an adequate SWPPP since at least May 23, 2013 through the present.

400.    Defendant has not developed and/or implemented BMPs to adequately minimize the exposure of pollutants to storm water at the NCWRP Facility.

401.     Defendant has not developed and/or implemented BMPs at the NCWRP Facility that adequately control and minimize polluted runoff from the NCWRP Facility.

402.     Defendant has not developed and/or implemented BMPs at the NCWRP Facility that adequately treat and remove pollutants in storm water prior to the discharge.

403.     Defendant has not developed and/or implemented adequate measures to reduce or eliminate storm water pollution that constitute BAT/BCT.

404.     Defendant has not developed and/or implemented BMPs at the NCWRP Facility that adequately prevent or control contaminated storm water from being discharged at the NCWRP Facility.

405.     Defendant has not developed and/or implemented BMPs at the NCWRP Facility that adequately prevent or control non-storm water discharges from being discharged at the NCWRP Facility.

406.     Defendant has not developed and/or implemented adequate BMPs at the NCWRP Facility to achieve storm water discharges that meet EPA Benchmarks, NALs, or applicable Water Quality Standards.

407.     Defendant has not developed and/or implemented adequate BMPs at the NCWRP Facility to achieve discharges that meet Effluent Limitation Guidelines.

408.     Defendant has not adequately evaluated and revised the NCWRP Facility's SWPPP to address these failures.

409.     Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the NCWRP Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

410.     Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

411.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs

Complaint for Declaratory and Injunctive Relief and Civil Penalties

necessary to achieve BAT/BCT at the NCWRP Facility since at least May 23, 2013. Each day that Defendant has operated the NCWRP Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

**T. Defendant's Monitoring Program at the NCWRP Facility**

412.    From 1997 through June 30, 2015, the NCWRP Facility was required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5).

413.    Sampling and analysis procedures require that a sample be taken from all discharge locations at the NCWRP Facility and that at least two samples are taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. (Industrial Permit, Sections B(5) and B(7)).

414.    From June 30, 2015 through the present NCWRP Facility is required to sample at least two storm events within the first half of each reporting year (July 1 to December 31) and two storm events within the second half of each reporting year (January 1 to June 30) in accordance with the sampling and analysis procedures in New Industrial Permit Section XI.B.

415.    Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the NCWRP Facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

416.    All monitoring data must be uploaded to SMARTS within 30 days of obtaining all results for each sampling event. (New Industrial Permit, XI.B.11.a)

417.    Plaintiffs are informed, believe, and thereon allege that despite the extremely high levels of pollutants reported in the samples that were taken at the NCWRP Facility, the Defendant has not sampled and submitted sampling reports as required.

418.     Plaintiffs are informed, believe, and thereon allege that Defendant has not successfully and consistently sampled and reported for nutrients, fertilizers, total suspended solids, pH-affecting substances, oil and grease, E. coli, total coliform, enterococcus, metals, nitrate, nitrite, and total nitrogen, fecal coliform, and ammonia as nitrogen, as required by the Permit.

419.     Information available to Plaintiffs indicates that Defendant has not submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark values or applicable Water Quality Standards, or filed any reports describing the NCWRP Facility's noncompliance with the Industrial Permit pursuant to Section C(11)(d) of the Industrial Permit.

420.     Information available to Plaintiffs indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in
Violation of the Industrial Permit's Discharge Prohibitions and
Receiving Water Limitations and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

421.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

422.     Plaintiffs are informed, believe, and thereon allege that as a result of the operations at each of the five Facilities, during every significant rain event, storm water containing pollutants harmful to fish, plant, bird life, and human health is discharged from each of the Facilities to the Receiving Waters.

423.     Plaintiffs are informed, believe, and thereon allege that Defendant's discharges of contaminated storm water from each of the five Facilities have caused, continue to cause, and threaten to cause pollution, contamination, and/or nuisance to the waters of the United States in violation of Discharge Prohibition A(2) of the Industrial

Permit and Sections III.C. and VI.C of the New Industrial Permit.

424.    Plaintiffs are informed, believe, and thereon allege that these discharges of contaminated storm water have adversely affected and continue to adversely affect human health and the environment in violation of Receiving Water Limitation C(1) of the Industrial Permit and Section VI.B. of the New Industrial Permit.

425.    Plaintiffs are informed, believe, and thereon allege that these discharges of contaminated storm water have caused or contributed to and continue to cause or contribute to exceedances of Water Quality Standards in violation of Receiving Water Limitation C(2) of the Industrial Permit, and Discharge Prohibition III.D. and Receiving Water Limitation VI.A. of the New Industrial Permit.

426.    Plaintiffs are informed, believe, and thereon allege that from at least May 23, 2013 through the present, Defendant has discharged, and continues to discharge, contaminated storm water from each of the five Facilities to Receiving Waters in violation of the prohibitions of the Industrial Permit. Thus, Defendant is liable for civil penalties for at least 9,125 violations of the Industrial Permit and the CWA.

427.    Plaintiffs are informed, believe, and thereon allege that Defendant's violations of the Industrial Permit and the CWA are continuous and ongoing.

428.    Defendant will continue to be in violation of the Industrial Permit requirements each day that any of the five Facilities discharge contaminated storm water in violation of Industrial Permit prohibitions.

429.    Each day that Defendant has discharged and/or continues to discharge polluted storm water from the WMSL Facility in violation of the Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

430.    Each day that Defendant has discharged and/or continues to discharge polluted storm water from the MBC Facility in violation of the Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

431.    Each day that Defendant has discharged and/or continues to discharge polluted storm water from the PLWWTP Facility in violation of the Industrial Permit is

a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

432.    Each day that Defendant has discharged and/or continues to discharge polluted storm water from the SBWRP Facility in violation of the Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

433.    Each day that Defendant has discharged and/or continues to discharge polluted storm water from the NCWRP Facility in violation of the Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

434.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

435.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water in
### Violation of the Industrial Permit's Effluent Limitations
### and the Clean Water Act
### (Violations of 33 U.S.C. §§ 1311(a), 1342)

436.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

437.    Plaintiffs are informed, believe, and thereon allege that, at each of the five Facilities, Defendant has failed to develop and/or implement BMPs that achieve compliance with BAT/BCT requirements of the Industrial Permit and the CWA.

438.    Plaintiffs are informed, believe, and thereon allege that, at each of the five Facilities, Defendant has failed to develop and/or implement BMPs that achieve compliance with Effluent Limitations Guidelines of the Industrial Permit and the CWA.

439.     Sampling of each of the five Facilities' storm water discharges as well as Plaintiffs' observations of each of the five Facilities demonstrate that, at each of the Facilities, Defendant has not developed and has not implemented BMPs that meet the standards of BAT/BCT. Thus, Defendant is in violation of Effluent Limitations B.3. of the Industrial Permit and V.A. of the New Industrial Permit.

440.     Sampling of each of the five Facilities' storm water discharges as well as Plaintiffs' observations of each of the five Facilities demonstrate that, at each of the facilities, Defendant has not developed and has not implemented BMPs that meet the standards of Effluent Limitations Guidelines in 40 C.F.R. Part 412 (Subchapter N). Thus, Defendant is in violation of Effluent Limitations B.1. of the Industrial Permit and V.B. of the New Industrial Permit.

441.     Plaintiffs are informed, believe, and thereon allege that Defendant has been in daily and continuous violation of the BAT/BCT requirements of the Industrial Permit and the CWA at each of the five Facilities every day since at least May 23, 2013, and of the BAT/BCT requirements of the New Industrial Permit at each of the five Facilities since July 1, 2015.

442.     Plaintiffs are informed, believe, and thereon allege that Defendant has been in daily and continuous violation of the Effluent Limitations Guidelines requirements of the Industrial Permit and the CWA every day since at least May 23, 2013, and of the Effluent Limitations Guidelines requirements of the New Industrial Permit since July 1, 2015.

443.     Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at each of the five Facilities is a separate violation of the New Industrial Permit and the CWA. (New Industrial Permit §§ I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b)).

444.     Plaintiffs are informed, believe, and thereon allege that Defendant's violations of BAT/BCT requirements of the Industrial Permit and the CWA at each of the five Facilities are ongoing.

445.     Plaintiffs are informed, believe, and thereon allege that Defendant's violations of the Effluent Limitations and the CWA at each of the five Facilities are ongoing.

446.     Defendant will continue to be in violation each day that any of the five Facilities operates without adequately developing and/or implementing BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at that facility.

447.     Defendant will continue to be in violation each day that any of the five Facilities operates without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines to prevent or reduce pollutants associated with industrial activity in storm water discharges at that facility.

448.     Each day that Defendant operates the WMSL Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

449.     Each day that Defendant operates the MBC Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

450.     Each day that Defendant operates the PLWWTP Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

451.     Each day that Defendant operates the SBWRP Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

452.     Each day that Defendant operates the NCWRP Facility without adequately

developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

453.    Each day that Defendant operates the WMSL Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

454.    Each day that Defendant operates the MBC Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

455.    Each day that Defendant operates the PLWWTP Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

456.    Each day that Defendant operates the SBWRP Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

457.    Each day that Defendant operates the NCWRP Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations Guidelines in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

458.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

459.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## THIRD CAUSE OF ACTION
### Failure to Adequately Develop, Implement, Assess, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Industrial Permit and Clean Water Act (Violations of 33 U.S.C. §§ 1311, 1342)

460.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

461.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to adequately develop, implement, assess, and/or revise a SWPPP for each of the five Facilities in a manner that meets the requirements set out in Section A and Provision E of the Industrial Permit and Section X and XX.B. of the New Industrial Permit.

462.     Defendant has been in violation of the SWPPP requirements at each of the five Facilities every day since at least May 23, 2013.

463.     Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA at each of the five Facilities are ongoing.

464.     Defendant will continue to be in violation of the SWPPP requirements each day that any of the Facilities operates with an inadequately developed, implemented, assessed, and/or revised SWPPP for that facility.

465.     Each day that Defendant operates the WMSL Facility without developing, implementing, assessing, and/or revising an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

466.     Each day that Defendant operates the MBC Facility without developing, implementing, assessing, and/or revising an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

467.     Each day that Defendant operates the PLWWTP Facility without developing, implementing, assessing, and/or revising an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

468.     Each day that Defendant operates the SBWRP Facility developing, implementing, assessing, and/or revising an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

469.     Each day that Defendant operates the NCWRP Facility without developing, implementing, assessing, and/or revising an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

470.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

471.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
**Failure to Implement an
Adequate Monitoring and Reporting Program
In Violation of the Industrial Permit and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

472.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

473.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement an adequate M&RP for each of the five Facilities as required by Section B and Provision E(3) of the Industrial Permit and Section XI of the

Complaint for Declaratory and Injunctive Relief and Civil Penalties

New Industrial Permit.

474.     Plaintiffs are informed, believe, and thereon allege that conditions at each of the five Facilities, as determined via sampling of storm water discharges from each of the Facilities, and the annual reports submitted by Defendant all demonstrate that each of the Facilities has not implemented an adequate M&RP that meets the requirements of the Industrial Permit and New Industrial Permit.

475.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to collect samples at each of the five Facilities from all discharge points for all required pollutants during all storm events in violation of Section B(5) of the Industrial Permit and XI.B. of the New Industrial Permit.

476.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to identify inadequacies in its SWPPPs and BMPs at each of the five Facilities.

477.     Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA are ongoing at each of the five Facilities.

478.     Defendant will continue to be in violation of the Industrial Permit, New Industrial Permit and the CWA each day that any of the Facilities operates with an inadequately implemented M&RP.

479.     Each day that Defendant operates the WMSL Facility without implementing an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

480.     Each day that Defendant operates the MBC Facility without implementing an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

481.     Each day that Defendant operates the PLWWTP Facility without implementing an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

482.     Each day that Defendant operates the SBWRP Facility without

implementing an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

483.    Each day that Defendant operates the NCWRP Facility without implementing an adequate M&RP for that facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

484.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

485.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Failure to Conduct Required Rain Event Sampling in Violation of the Industrial Permit

486.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

487.    Plaintiffs are informed, believe, and thereon allege that Defendant is in violation of Industrial Permit, Section B(5)(c) by failing to sample for all Subchapter N pollutant parameters at the WMSL Facility since at least May 23, 2013.

488.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 23, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

489.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. §1365(a). Continuing commission of the omissions alleged above would irreparably harm the Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

## SIXTH CAUSE OF ACTION
### Unpermitted Discharge of Pollutions
### In Violation of CWA Section 301(a)
### (Violations of 33 U.S.C. § 1311)

490.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

491.     Plaintiffs are informed, believe, and thereon allege that Defendant is in violation of CWA section 301(a), 33 U.S.C. § 1311(a) for its unpermitted discharge of pollutants from each of the following Facilities to the Waters of the United States: The MBC Facility, the PLWWTP Facility, the SBWRP Facility, and the NCWRP Facility.

492.     Plaintiffs are informed, believe, and thereon allege that Defendant is in violation of CWA section 301(a), 33 U.S.C. § 1311(a) for its unpermitted discharge of pollutants, including contaminated storm water from landfill operations, from the WMSL Facility to the Waters of the United States.

493.     Defendant has been in violation of CWA section 301(a) each day it has discharged pollutants from the MBC Facility to waters of the United States without a permit, since May 23, 2013. Defendant will continue to be in violation of the CWA each day it has unpermitted discharges of pollutants from the MBC Facility to the waters of the United States.

494.     Defendant has been in violation of CWA section 301(a) each day it has discharged pollutants from the PLWWTP Facility to waters of the United States without a permit, since May 23, 2013. Defendant will continue to be in violation of the CWA each day it has unpermitted discharges of pollutants from the PLWWTP Facility to the waters of the United States.

495.     Defendant has been in violation of CWA section 301(a) each day it has discharged pollutants from the SBWRP Facility to waters of the United States without a permit, since May 23, 2013. Defendant will continue to be in violation of the CWA each day it has unpermitted discharges of pollutants from the SBWRP Facility to the waters of the United States.

496.     Defendant has been in violation of CWA section 301(a) each day it has discharged pollutants from the NCWRP Facility to waters of the United States without a permit, since May 23, 2013. Defendant will continue to be in violation of the CWA each day it has unpermitted discharges of pollutants from the NCWRP Facility to the waters of the United States.

497.     Defendant has been in violation of CWA section 301(a) each day it has discharged pollutants from the WMSL Facility to waters of the United States without a permit, since May 23, 2013. Defendant will continue to be in violation of the CWA each day it has unpermitted discharges of pollutants from the WMSL Facility to the waters of the United States.

498.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

499.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter.

/././

/././

/././

## SEVENTH CAUSE OF ACTION
### Discharge of Unauthorized Non-Stormwater
### Discharges in Violation of Sections A.1. of Industrial Permit
### And III.B. of New Industrial Permit

500.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

501.     Plaintiffs are informed, believe, and thereon allege that Defendant is in violation of Section A.1. of the Industrial Permit and III.B. of the New Industrial Permit each day is has discharged unauthorized non-storm water containing pollutants from any of the five Facilities to the Waters of the United States.

502.     By discharging unauthorized non-storm water discharges containing pollutants from WMSL, NCWRP, SBWRP, PLWWTP, and MBC into Receiving Waters, Defendant has been in violation of Section A.1. of the Industrial Permit and III.B. of the New Industrial Permit every day since May 23, 2013. Defendant will continue to be in violation each day it discharges unauthorized non-storm water discharges containing pollutants from any of the Facilities to Receiving Waters.

503.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 23, 2013 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

504.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiffs pray judgment against Defendant as set forth hereafter

VII.   **RELIEF REQUESTED**

505.     Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

a.     A Court order declaring Defendant to have violated and to be in

violation of Section 301(a) and (b) of the CWA, 33 U.S.C. § 1311(a) and (b), for its unlawful discharges of pollutants from each of the five Facilities in violation of a permit issued pursuant to section 402(p) of the CWA, 33. U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements for each of the five Facilities, and for failing to comply with the substantive and procedural requirements of the Industrial Permit, and as of July 1, 2015, the New Industrial Permit for each of the five Facilities;

b.    A court order enjoining the Defendant from discharging pollutants from each of the five Facilities to storm water discharge points, which discharge to Receiving Waters;

c.    A Court order enjoining the Defendant from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Permit and New Industrial Permit;

d.    A Court order assessing civil monetary penalties of $37,500 per day per violation for each violation of the CWA at each of the five Facilities occurring after January 27, 2009 but before November 2, 2015, and $51,750 for violations occurring after November 2, 2015, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.1-19.4;

e.    A Court order requiring Defendant to take appropriate actions to restore the quality of waters impaired by its activities;

f.    A Court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

/././

/././

/././

/././

1        g.        Any other relief as this Court may deem appropriate.

2    Dated: July 31, 2018

3                                             Respectfully submitted,

4                                             COAST LAW GROUP LLP

5

6                                             By: s/Livia B. Beaudin
                                              LIVIA B. BEAUDIN
7                                             Attorney for Plaintiffs
8                                             COASTAL ENVIRONMENTAL
                                              RIGHTS FOUNDATION
9                                             E-mail: livia@coastlaw.com

10

11                                            SAN DIEGO COASTKEEPER

12

13                                            By: s/Matt O'Malley
                                              MATT O'MALLEY
14                                            Attorney for Plaintiffs
15                                            SAN DIEGO COASTKEEPER
                                              E-mail: matt@sdcoastkeeper.org
16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties